ADAMS FORD BELTON,
INC., Appellant,

v.

MISSOURI MOTOR VEHICLE
COMMISSION, Respondent.

No. 79563.

Supreme Court of Missouri,
En Banc.

May 27, 1997.

Rehearing Denied June 17, 1997.

Robert O. Jester, Sharon Kennedy, Kansas City, for Appellant.

Jeremiah W. (Jay) Nixon, Attorney General, James R. Layton, Stephen R. Martin II, Assistant Attorneys General, Jefferson City, for Respondent.

HOLSTEIN, Chief Justice.

Adams Ford Belton, Inc., brought a declaratory judgment and injunction action seeking to have certain regulations of the Missouri Motor Vehicle Commission (Commission) declared unconstitutional and to terminate a disciplinary proceeding by the Commission against Adams Ford. That action was consolidated with a subsequent petition for review of the administrative disciplinary proceeding filed in the circuit court. The circuit court entered summary judgment in favor of the Commission in both cases. The judgment was appealed to the court of appeals. Because of the general interest or importance of the questions presented, the case is transferred to this Court. *Mo. Const. art. V, sec. 10.*

The issues presented here include whether the circuit court correctly upheld the constitutionality of state regulations prohibiting motor vehicle advertisements that refer to "invoice price" or that mention price matching without disclosing all limitations imposed by the dealer. Adams Ford challenges the regulations on equal protection, privileges and immunities, and First Amendment grounds. The regulations do not violate those constitutional provisions. The judgment of the circuit court is affirmed.

## I.

■ At the outset, this Court must determine sua sponte whether it has jurisdiction of this appeal. The appeal was initially taken to the Missouri Court of Appeals, Western District. The court of appeals transferred this case because "it presents a real and substantial constitutional issue" involving the validity of certain regulations of the Commission. The court of appeals reasoned that because duly promulgated regulations have the force and effect of statutes and this Court has exclusive appellate jurisdiction over the constitutionality of statutes, this Court had exclusive jurisdiction over an appeal involving the constitutionality of a regulation.

The Supreme Court has exclusive appellate jurisdiction of all cases involving the validity of a statute. *Mo. Const. art. V, sec. 3.* No case cited or found has held that such jurisdiction extends to claims regarding the constitutionality of a regulation issued by an administrative agency. The constitution makes separate reference to administrative regulations and to statutes. For example, article III, sec. 34, provides for the revision, digesting and promulgation of statutes. However, article IV, sec. 16 makes different provision for the adoption of administrative rules and regulations. *See also Mo. Const. art. V, sec. 18* (making special provision for judicial review of certain administrative agency rules).

From the above, it is obvious that the drafters of the constitution drew a clear distinction between statutes and administrative rules. When the word "statute" was used in article V, sec. 3 it plainly was not intended to include agency regulations.

This Court recently held that its appellate jurisdiction under article V, sec. 3 did not extend to the validity of a local ordinance because the constitutional questions did not directly involve the validity of a statute. *Alumax Foils, Inc. v. City of St. Louis,* 939 S.W.2d 907, 912 (Mo. banc 1997). Like local ordinances, administrative regulations enacted pursuant to an authorizing statute may have the force of law, but such regulations

are not statutes. Here, no claim is made that the statutes authorizing the regulations are invalid. Because no claim involving the validity of a statute is involved, initial appellate jurisdiction lies with the court of appeals. Transfer on the grounds stated by the court of appeals was improvident.

■ Nevertheless, the constitution authorizes transfer by order of this Court before or after opinion because of the general interest or importance of the question involved in the case. This case involves important issues of general interest regarding commercial free speech rights in advertising. For that reason, this Court grants transfer. *Mo. Const. art. V, sec. 10.* Because the issues have been fully briefed and argued on the merits, the case is submitted.

## II.

On April 2, 1994, Adams Ford, a car dealership in Missouri, placed an advertisement in the *Kansas City Star,* a newspaper distributed in Missouri and Kansas. The advertisement stated, "$5,000* GUARANTEES WE WILL BEAT ANY DEAL, ANYWHERE, ANY TIME." The asterisk referred to smaller print at the bottom of the advertisement, which stated, " *ALL APPLICABLE REBATES TO DEALER[.]" On May 28, 1994, Adams Ford placed another advertisement in the *Kansas City Star,* which read: "$100 OVER FORD FACTORY INVOICE ON ALL MODELS IN STOCK[.]"

After receiving a complaint from another dealership, the Commission charged Adams Ford with violating its advertising regulations. An administrative disciplinary proceeding was commenced pursuant to sec. 301.562.[1] With respect to the April 2 advertisement, Adams Ford was charged with violating 12 C.S.R. 60–5.010(2)(AA), which provides: "[Licensed motor vehicle dealers] shall not make any reference to matching or bettering competitors' prices in any advertisement unless all limitations are clearly and conspicuously disclosed. Any policy shall not place an unreasonable burden on the consumer[.]" Adams Ford was also charged

---

1. All references to statutes are to RSMo 1994, unless noted otherwise.

with violating 12 C.S.R. 60–5.010(2)(M) for its May 28 advertisement. This regulation prohibits licensed dealers from advertising "a motor vehicle with regards [sic] to the invoice price, dealer cost, or any similar term or phrase as consumers equate invoice with cost which is misleading and prohibited[.]"

Following a disciplinary hearing, the hearing officer concluded that Adams Ford violated both regulations. For violating 12 C.S.R. 60–5.010(2)(AA), a private letter of reprimand was to be issued. For violating 12 C.S.R. 60–5.010(2)(M), the hearing officer ordered the dealership license suspended for two days.

Adams Ford appealed the decision of the hearing officer to the Commission as provided by 12 C.S.R. 60–4.040(9). In an opinion dated May 23, 1995, the Commission concluded that the facts did not support the hearing officer's imposition of a two-day suspension. The Commission ordered a private reprimand for both violations.

On October 21, 1994, prior to the administrative hearing, Adams Ford filed a declaratory judgment action in the circuit court pursuant to sec. 536.050. Adams Ford claimed that the Commission's regulations violate its constitutional rights. On June 19, 1995, after the Commission issued its opinion, Adams Ford filed a petition in the circuit court seeking reviewing of the agency's decision. The circuit court consolidated both actions. The parties agreed that the record of the administrative proceeding would serve as the record for disposition of the case in the circuit court. The parties filed cross-motions for summary judgment. Summary judgment was entered upholding the constitutionality of the advertising regulations.

### III.

◼ In its first point on appeal, Adams Ford argues that the circuit court failed to state all of the relevant and undisputed facts in the court's finding of facts and conclusions of law. However, a circuit court's grant of summary judgment is reviewed de novo. *ITT Commercial Fin. Corp. v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). Summary judgment is proper if the record, viewed in a light most favorable to the non-moving party, shows that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. *Rule 74.04(c)(3)*. This Court is not limited to consideration of the factual findings of the circuit court. In sum, any deficiency in the findings of fact is of no consequence in this appeal.

### IV.

◼ Adams Ford asserts that the advertising regulations violate equal protection in that the advertising regulations only apply to "resident" motor vehicle dealers. Minimal scrutiny is required unless it is shown that the regulation applies to a suspect class or the regulation impinges upon a fundamental right. There is nothing suspect about a class that includes only automobile dealerships doing business inside the state. In addition, as is further discussed under Part VI of this opinion, there is no free speech violation and, thus, no impingement on a fundamental right. Only minimal scrutiny is required, that is, an inquiry as to whether the regulations are rationally related to a legitimate governmental interest. *See Dunagin v. City of Oxford, Miss.*, 718 F.2d 738, 752–53 (5th Cir.1983), *cert. denied*, 467 U.S. 1259, 104 S.Ct. 3553, 82 L.Ed.2d 855 (1984); *see also Williams v. Vermont*, 472 U.S. 14, 22–23, 105 S.Ct. 2465, 2471–72, 86 L.Ed.2d 11 (1985); *Metropolitan Life Ins. Co. v. Ward*, 470 U.S. 869, 881, 105 S.Ct. 1676, 1683, 84 L.Ed.2d 751 (1985).

The Commission's regulations serve a legitimate governmental interest by ensuring that consumers who purchase vehicles from car dealers doing business in this state are not misled by dealers' advertisements. Assuming, without deciding, that the legislature could have empowered the Commission to regulate in-state advertisement by all dealers, licensed or unlicensed, this conclusion is not dispositive. The state may proceed step-by-step to ameliorate a perceived evil or it may perceive evils in the same field to be of different dimensions and proportions, requiring different remedies. *Williamson v. Lee Optical*, 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955).

In this case, the legislature may have determined that it was difficult, if not impossible, for the Commission to enforce its regulations against out-of-state dealers. In addition, the legislature may have intended to protect only consumers who purchase vehicles in this state, leaving consumers who choose to purchase vehicles in other states to such remedies or protection as those states may choose to provide. Clearly, these considerations provide a rational basis for the treatment of advertising by in-state dealers in a manner different from advertising by dealers who do not sell vehicles in the state of Missouri.

## V.

■■■ Adams Ford next argues that the advertising regulations violate the Privileges and Immunities Clause of the Fourteenth Amendment in that the regulations treat resident and non-resident dealers differently. The argument does not merit an extended discussion. The Privileges and Immunities Clause of the Fourteenth Amendment protects only certain rights of national citizenship, none of which are established here. *See Twining v. New Jersey*, 211 U.S. 78, 96–97, 29 S.Ct. 14, 18–19, 53 L.Ed. 97 (1908). Assuming the argument is directed at the Privileges and Immunities Clause of Article IV, Adams Ford lacks standing to assert such claim because corporations are not citizens of the state within the meaning of that clause. *See Norfolk & W. R.R. v. Pennsylvania*, 136 U.S. 114, 118, 10 S.Ct. 958, 960, 34 L.Ed. 394 (1890).

## VI.

■■■ The parties agree that the advertisements in question are commercial speech. Because commercial advertising has greater potential for deception and confusion than non-commercial speech, its content may be more readily regulated. The Supreme Court has formulated a four-part test for determining whether certain commercial speech is protected by the First Amendment:

For commercial speech to come within [the protection of the First Amendment], it at least must concern a lawful activity and not be misleading. Next, we ask whether

the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

*Central Hudson Gas & Elec. Corp. v. New York Pub. Serv. Comm'n*, 447 U.S. 557, 566, 100 S.Ct. 2343, 2351, 65 L.Ed.2d 341 (1980). Under this analysis, the threshold inquiry is whether the prohibited advertising is truthful, nonmisleading speech. If the prohibited speech is false or misleading, it is not protected by the First Amendment and no further analysis is required. The state may prohibit false or misleading commercial speech. *In re R.M.J.*, 455 U.S. 191, 203, 102 S.Ct. 929, 937–38, 71 L.Ed.2d 64 (1982); *Central Hudson Gas & Elec. Corp.*, 447 U.S. at 566, 100 S.Ct. at 2351. Though states may not absolutely prohibit commercial advertising that is merely potentially misleading, advertising that is inherently misleading or by experience has proved to be subject to abuse may be regulated. *In re R.M.J.*, 455 U.S. at 203, 102 S.Ct. at 937–38.

### A.

■■■ In Missouri, a licensed dealer may not advertise the price of a motor vehicle in relation to "invoice price." *12 C.S.R. 60–5.010(2)(M)*. Here there is ample evidence to indicate that as used in the advertisement, "invoice price" is likely to deceive and is, therefore, inherently misleading.

At the administrative hearing, George Gurnett, a program administrator for the Commission with four years experience in the regulation of motor vehicle advertising, explained why the term "invoice price" misleads consumers:

The invoice price ... represents, and I may not be getting this exactly right ... but I believe it represents a point for floor planning between the dealership and the floor planner. It [is] not necessarily the same as what most customers would equate invoice as being[,] the price a dealer paid the manufacturer for the vehicle. This is because the dealer has the opportunity for rebates, holdbacks and other in-

centives that would change the price that they ultimately pay their distributor for the vehicle. Because of this invoice, while it appears to represent the bottom line or what a dealer pays the manufacturer, it does not in most cases represent that.

The testimony of Mr. Gurnett is consistent with that of Scott R. Adams, the president of Adams Ford. Mr. Adams testified that invoice price is not the same as dealer cost, and that "nobody knows what dealer cost is." He explained that most dealers borrow money from Ford Motor Credit to finance cars placed on their lots. He stated that invoice price is the price that Ford Motor Credit pays Ford Motor Company for the vehicle on behalf of the dealer. However, as stated on the invoice displayed on each vehicle during Adams Ford's advertised promotion, the invoice price "may not reflect the final cost of the vehicle in view of the possibility of future rebates, allowances, discounts and incentive awards from Ford Motor Company to the dealer." When asked if he thought that customers equated invoice price with dealer cost, Mr. Adams admitted, "I don't know what a customer thinks."

From the above testimony, it is clear that in the automobile industry the term "invoice price" has a specialized, unique meaning. An "invoice" is generally understood to mean "an itemized statement furnished to a purchaser by a seller and [usually] specifying the price of goods and services and terms of sale." *Webster's Third New International Dictionary* 1190 (1981). "Invoice price" ordinarily means the price paid by the dealer for the vehicle. However, as Adams Ford admits, within the automotive industry, invoice price does not reflect the dealer's price. That price is subject to manipulation by undisclosed dealer rebates, allowances or incentives. The term "invoice price" is inherently misleading as used in motor vehicle advertisements because of the peculiar meaning given the term by the automotive industry, which is at variance with the commonly understood meaning of the words.

In addition, the regulations give dealers wide latitude in advertising the price of their vehicles in meaningful, non-deceptive ways. A dealer may advertise the actual sale price

of the vehicle or advertise the price in relation to the manufacturer's suggested retail "sticker price" displayed on the vehicle. *See 12 C.S.R. 60–5.010.* By contrast, no useful information is conveyed to the consumer by an advertisement of a vehicle with respect to invoice price. Thus, the regulations prohibit only the advertisement of price in a manner that is, at best, meaningless. The United States Supreme Court has indicated that "commercial speech that is devoid of intrinsic meaning may be inherently misleading, especially if such speech historically has been used to deceive the public." *Peel v. Attorney Registration & Disciplinary Comm'n*, 496 U.S. 91, 112, 110 S.Ct. 2281, 2293–94, 110 L.Ed.2d 83 (1990) (Marshall and Brennan, JJ., concurring).

The term "invoice price" in a motor vehicle advertisement is inherently misleading and, therefore, beyond First Amendment protection. The holding here is consistent with that in *Joe Conte Toyota, Inc. v. Louisiana Motor Vehicle Commission*, 24 F.3d 754 (5th Cir.1994), and *Barry v. Arrow Pontiac, Inc.*, 100 N.J. 57, 494 A.2d 804 (1985). In both of these cases, the courts employed a similar analysis to uphold the constitutionality of regulations prohibiting the use of the term "invoice" in automobile advertising.

### B.

■ Adams Ford also challenges 12 C.S.R. 60–5.01(2)(AA) on First Amendment grounds. This regulation prohibits "reference to matching or bettering competitors' prices in any advertisement unless all limitations are conspicuously disclosed." The regulation further prohibits price matching or bettering policies that "place an unreasonable burden on the consumer."

Adams Ford was disciplined by the Commission under this regulation for failing to clearly and conspicuously disclose all limitations in its April 2, 1994, advertisement, which read: "$5,000 GUARANTEES THAT WE WILL BEAT ANY DEAL, ANY WHERE, ANYTIME." This advertisement was supposed to contain a sentence that advised the consumer that further details were available at the store. In a letter to Adams Ford, the *Kansas City Star* acknowledged its

error in omitting the disclaimer stating, "see dealer for details."

Adams Ford concedes that all of the relevant terms were not disclosed in the advertisement itself. However, it points out that a copy of the written policy was posted at the dealership and a copy was made available to any customer who wished to view it. It is further asserted that the numerous terms and conditions were too voluminous to publish in the advertisement. It argues that the regulation's requirement that all terms be clearly and conspicuously disclosed imposes an undue burden on dealers and, as a result, has a chilling effect on Adams Ford's right to free speech.

The advertisements prohibited by the regulations are not protected by the First Amendment because they are inherently misleading and subject to abuse by motor vehicle dealers. The terms and conditions of Adams Ford's price matching policy would likely exclude most customers from availing themselves of the "guarantee." The price matching policy reveals that the offer was subject to twenty terms and conditions. Among the conditions was the limitation that the "offer expires at the close of business the day the ad runs, unless extended by a new advertisement." The customer was also required to "have made a deposit on the car at the other store." In his testimony before the hearing officer, Mr. Gurnett explained why this restriction would prohibit most customers from benefiting from the so-called "guarantee":

> Generally when a customer makes a deposit on a vehicle at a dealership, they are usually locked in at that point into purchasing that car or they will lose their deposit. I feel that at that point, a dealer who would offer to beat a price would have no problem beating any price, because they know that in order for the customer to take advantage of the guarantee that they would have to lose a deposit at another store.

Because the terms and conditions of a price matching policy may render a "guarantee" illusory, advertisements that refer to price matching are inherently misleading and likely to be subject to abuse unless accompanied by a full and fair disclosure of the terms of the price matching policy. Because such advertisements are inherently misleading, they are not protected by the First Amendment.

Adams Ford further asserts that a narrowly tailored regulation, such as requiring the dealer to provide a copy of its policy to each customer, would amply protect the state's interest without overly burdening its right to free speech. This regulation is narrowly tailored to achieve the state's goal of full and fair disclosure. Here there is no absolute prohibition of price matching. The regulation merely requires full disclosure of the details. That remedy is preferred over a complete prohibition. *See Bates v. State Bar of Ariz.*, 433 U.S. 350, 383, 97 S.Ct. 2691, 2708–09, 53 L.Ed.2d 810 (1977). Furthermore, this argument fails to take into consideration the burden placed on the unwitting consumer who arrives at the dealership with a bona fide advertised price of another dealer, only to be disappointed to learn that the price matching "guarantee" does not apply because the consumer arrived a day after the running of the advertisement, or that the consumer could not take advantage of the "guarantee" because no down payment had been made on a vehicle at another dealership. The regulation is narrowly designed to prevent such baiting of consumers.

## VII.

In its final point, Adams Ford argues that the Commission lacks statutory authority to discipline it because there was no finding that the advertisements were false. The Commission may take disciplinary action against licensed dealers for certain conduct, including "[o]btaining or attempting to obtain any money ... by fraud, deception, or misrepresentation" or for publishing "any advertisement or solicitation which is false[.]" *Sec. 301.562.2(5)* and *sec. 301.562.2(11)*.

Adams Ford concedes that the Commission may prohibit false advertising, but argues that the Commission lacks authority to discipline it for advertising that is misleading. The adjective "false" describes not only things that are "not truthful," but also things that are "deceptive," "illusory" or that have a

tendency to "mislead." *Webster's Third New International Dictionary* 819 (1981). Likewise, the words "deception" and "misrepresentation" are used to refer to misleading acts. "Deception" is defined as "the act of ... misleading," *id.* at 585, and "misrepresentation" as a "misleading representation," *id.* at 1445. The statutory language indicates a legislative intent to prohibit not only advertising that is patently untruthful, but also advertising that is inherently misleading. Thus, the Commission acted within its authority in reprimanding Adams Ford for its advertisements.

## VIII.

The judgment is affirmed.

All concur.